UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROSETTE R.,[1]

Plaintiff,

-against-

FRANK J. BISIGNANO, COMMISSIONER OF SOCIAL SECURITY,[2]

Defendant.

25-CV-9788 (ER) (RFT)

**REPORT AND RECOMMENDATION**

**TO THE HONORABLE EDGARDO RAMOS, UNITED STATES DISTRICT JUDGE:**

Plaintiff Rosette R., proceeding through counsel, seeks judicial review of a final determination by Defendant Frank J. Bisignano, Commissioner (the "Commissioner") of the Social Security Administration (the "SSA"), denying her application for Social Security disability benefits ("SSD") under the Social Security Act (the "Act"). (*See* ECF 1, Compl. ¶ 9.) Plaintiff was determined to be partially entitled to Supplemental Security Income ("SSI") payments. (*See id.*) Plaintiff requested review, seeking reversal of the adverse part of the Commissioner's decision and remand for further administrative proceedings. (*See* ECF 8, Pl.'s Br. at 9-10.) Having carefully reviewed the administrative record (the "Record") and the parties' submissions, for the reasons

---

1 To protect Plaintiff's privacy, she is identified by her first name and last initial.

2 Frank J. Bisignano is the Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he should be substituted as the defendant in this action.

set forth below, I respectfully recommend that Plaintiff's motion be GRANTED and that the case be remanded for further administrative proceedings.[3]

## BACKGROUND

### I. Procedural History

Plaintiff's applications for SSD and SSI were filed on January 26, 2023. (*See* R. at 19.)[4] She alleged disability beginning on or around January 16, 2016. (*See id.* at 254.) Upon the initial denial of her claims for both SSI and SSD on August 1, 2023, and again after reconsideration on December 15, 2023, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 15, 2024 by ALJ Joan Sedaca. (*See id.* at 18-19.)[5] Plaintiff and vocational expert ("VE") Helene J. Feldman both testified. (*See id.*)

The ALJ issued a decision on December 16, 2024, finding that Plaintiff was not entitled to SSD and was partially entitled to SSI. (*See id.* at 16-31.) The ALJ found that Plaintiff was not disabled prior to October 15, 2020, and therefore not entitled to SSD, since disability could not be established prior to her date last insured ("DLI"), which was June 30, 2018. (*See id.* at 20.) Plaintiff requested review of the unfavorable portion of the ALJ's decision on February 10,

---

[3] Unless indicated otherwise, this report and recommendation omits internal quotation marks, citations, and alterations to quoted text.

[4] Citations to "R." are to the administrative record (ECF 7), and the page citations are to the numbers in the lower right corner of each page, not to the numbers at the top of the page that are part of the ECF numbering system.

[5] Plaintiff previously applied for both SSD and SSI on August 6, 2020, and the 2023 application was reopened based on good cause. (*See* R. at 39.)

2025, and the Appeals Council denied the request on September 25, 2025. (*See id.* at 1-3, 225-27.)[6] Plaintiff now appeals.

## II. Administrative Record

### A. Plaintiff's Background and Symptoms

Plaintiff was born in 1964. (*See* R. at 260.) She completed her General Educational Development ("GED") degree in 1990. (*See id.* at 267.) Plaintiff was a dental assistant who held six different jobs between 2008 and January 2016. (*See id.* at 267, 330, 447.) In each position, Plaintiff generally had the same job description, which included preparing patients for procedures, setting up instrument trays, and maintaining inventory of supplies. (*See id.* at 72, 332-38.) Her prior jobs all involved lifting and moving heavy equipment and unloading office materials; the heaviest weight she lifted or carried was 50 pounds. (*See id.*) Her work required walking, standing, sitting, climbing, stooping, kneeling, crouching, crawling, handling big objects, reaching, and writing, typing, or handling small objects for 40 hours a week. (*See id.*)[7]

Plaintiff also had an "unsuccessful work attempt" as a recess asserter in a laboratory from March 15 to April 4, 2023. (*Id.* at 39, 41, 43.) She attributed her inability to finish training and perform this job – which required sitting for many hours – to her condition. (*See id.* at 43-45.) At the August 2024 hearing, Plaintiff testified that she had been walking with a cane for

---

[6] In a letter dated March 11, 2025, Plaintiff's non-attorney representative offered to amend Plaintiff's onset date to March 31, 2017, the date of the MRI, if doing so would result in a fully favorable decision. (*See* R. at 424.)

[7] In the work history report, the applicant is to indicate how many "total hours each day" she performed the enumerated activities, and Plaintiff listed 40 hours for each. I infer that Plaintiff meant she was involved with each activity 40 hours a week.

about five years and had trouble walking and navigating stairs going to and from work, both in her home on the fourth floor and to access the subway, which caused stress on her back and legs. (*See id.* at 45-47.) She also spoke of the discomfort she felt after sitting for about four hours. (*See id.*)

In the disability report completed with her SSD and SSI applications, she alleged disability beginning January 16, 2016; her conditions consisted of spinal stenosis, hypertension, lumbar radiculopathy, chronic back pain, and osteoarthritis. (*See id.* at 260, 263.)[8] Plaintiff testified that her pain has worsened since June 30, 2018, her DLI, and that she has also developed new problems, including numbness in her right foot and right hand. (*See id.* at 50.)

---

[8] Spinal stenosis is a medical condition that causes narrowing of the spine, putting pressure on the nerves and spinal cord. It can cause "pain, tingling, numbness and muscle weakness." This condition happens most often in the neck or the lower back, and in the lower back, it may lead to pain or cramping in the legs and back pain. The symptoms could get better when "bending forward or sitting." *Spinal Stenosis*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last visited Oct. 9, 2026).

Lumbar radiculopathy is a condition caused by a pinched nerve in the lumbar spine, the lower back region of the spine which consists of five vertebrae. The lumbar vertebrae are what supports most of the weight of the body and enables it to "walk, run, sit, lift, and move [ ] in all directions." *Lumbar Spine*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/articles/22396-lumbar-spine (last visited Oct. 9, 2026); *Radiculopathy*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/22564-radiculopathy (last visited Oct. 9, 2026).

Osteoarthritis is the most common type of arthritis, occurring when "the protective cartilage that cushions the ends of the bones wears down over time"; symptoms include pain, stiffness, tenderness, and loss of flexibility. *Osteoarthritis*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/osteoarthritis/symptoms-causes/syc-20351925 (last visited Oct. 9, 2026).

B. Medical Evidence

The administrative record includes some medical evidence dating back to 2016. Plaintiff had multiple visits to the hospital in 2016, including for chest pain and cardiac-related symptoms. (*See* R. at 584-90. 601-02, 606-07.) The records associated with these visits note that Plaintiff's known health issues were acute headache and chest pain, chronic high cholesterol, obesity, pain in the buttocks, and hypertension. (*See id.* at 586.)

On March 31, 2017, Dr. Danielle Lasalandra sent Plaintiff for an MRI of her lumbar spine due to back pain. (*See id.* at 439; ECF 8, Pl.'s Br. at 2.) The results noted that Plaintiff had "pain radiating down bilateral buttocks," and the imaging showed spinal stenosis and nerve root impingement. (*See* R. at 420, 483.)[9] Clinical notes from October 12, 2022 following a visit with Dr. Hannah Brooks indicate that she prescribed medication for Plaintiff's hypertension and heart failure and for her chronic lumbar radiculopathy and ordered X-rays of Plaintiff's right hand and wrist. (*See id.* at 503-05.)

Plaintiff began receiving treatment from Dr. Brooks, an internist, every three months beginning December 10, 2019. (*See* R. at 432; *see also* ECF 8, Pl.'s Br. at 3.) Plaintiff received another MRI of the lumbar spine on October 15, 2020 – the date the ALJ found that Plaintiff had become disabled. (*See* R. at 437; *see also* ECF 8, Pl.'s Br. at 2.) The results history from this MRI noted that Plaintiff had been experiencing low back pain for six weeks. (*See* R. at 437.) The

[9] Nerve root impingement is a type of pinched nerve – where the nerve is compressed by surrounding tissue – which happens when a nerve branches off the spinal cord. *Pinched Nerve*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/6481-pinched-nerves (last visited Oct. 9, 2026). Plaintiff's medical records describe impingement of nerves under the overview of her chronic lumbar radiculopathy. (*See* R. at 447.)

results described slight progression since the 2017 MRI but overall concluded that the findings were "without appreciable change." (*Id.* at 437-38.)

Based on her review of the 2017 and 2020 MRIs, Dr. Brooks diagnosed Plaintiff with chronic lumbar radiculopathy. (*See id.* at 432-36.) Dr. Brooks noted "progressively debilitating back pain, inability to ambulate without assistance, and inability to stand unassisted for more than ten to fifteen minutes." (*Id.* at 432.) Plaintiff was prescribed medication, including, as relevant here, for hypertension and edema, for asthma, and for nerve pain. (*See id.* at 265-66.)

1. Treatment History

*a. Dr. Danielle Lasalandra/New York-Presbyterian Hospital*

Plaintiff first visited Dr. Lasalandra on March 31, 2017, and last visited her on October 15, 2020. (*See id.* at 344.) Dr. Lasalandra ordered both the 2017 and 2020 MRIs. Plaintiff testified that Dr. Lasalandra prescribed a cane before December 2019, when Plaintiff was referred to Dr. Brooks. (*See id.* at 47-48, 344.) Dr. Laiping Xie's consultive examination report indicates that Plaintiff began using a cane in 2018. (*See id.* at 467.)

*b. Dr. Hannah Brooks/Farrell Community Health Center*

Plaintiff's first visit with Dr. Brooks at the Farrell Community Health Center, affiliated with New York Presbyterian Hospital, was on December 10, 2019, and her last visit was on December 1, 2022. (*See id.* at 344.) Dr. Brooks evaluated Plaintiff for lumbar radiculopathy, spinal stenosis, chronic back pain, osteoarthritis, and hypertension. (*See id.*) Dr. Brooks prescribed medication for asthma, hypertension, edema, and nerve pain, among other conditions. (*See id.* at 501-02.) Dr. Brooks indicated in the Multiple Impairment Questionnaire

that Plaintiff had "trialed" physical therapy with no improvement; the record does not specify when Plaintiff tried physical therapy. (*Id.* at 433, 490.)

2. Medical Opinion Evidence

*a. Hannah Brooks, M.D. (Treating Source)*

Plaintiff was referred to Dr. Brooks in 2019. (*See* R. at 38). In the Multiple Impairment Questionnaire dated November 29, 2022, Dr. Brooks noted that in her best medical opinion, Plaintiff's symptoms and related limitations applied as far back as January 1, 2016. (*See id.* at 457, 462.) This opinion relied on the 2017 and 2020 MRI results, Plaintiff's chronic lumbar radiculopathy with progressive, debilitating back pain and impingement of the nerves, her inability to ambulate or stand for more than ten to fifteen minutes without assistance, and the failed physical therapy. (*See id.* at 420.) The Multiple Impairment Questionnaire indicated that Plaintiff could occasionally lift or carry up to five pounds. (*See id.* at 434.)

*b. Laiping Xie, M.D. (Consultive Examiner)*

On July 14, 2023, Dr. Xie conducted an internal medicine consultive examination at the request of the SSA. (*See id.* at 465-70.) Dr. Xie's diagnoses listed low back pain and sciatica; right carpal tunnel syndrome; hypertension; and asthma. (*See id.* at 469.)

Dr. Xie opined that the Plaintiff's use of the cane beginning in 2018 was medically necessary and that she would lean on her right side when she walked with it. (*See id.* at 467.) He said that Plaintiff faced moderate limitations when it came to lifting, carrying, pulling, pushing, prolonged standing, walking, climbing stairs, squatting, and bending. (*See id.* at 469.) Further, he discussed Plaintiff's carpal tunnel syndrome and numbness, noting her statement

that it is "difficult to lift or carry things that are heavy." (*Id.* at 466.) He did not address her limitations on sitting. (*See id.* at 420.) As for Plaintiff's social history and day-to-day activities, Dr. Xie noted that Plaintiff could cook, clean, do laundry, shop, shower, and dress herself as needed, and that she smokes three cigarettes daily and has previously used marijuana for her pain. (*See id.* at 420, 467.) He listed Plaintiff's medications: Gabapentin, Furosemide, Cyclobenzaprine, Tramadol, Amlodipine, Venlafaxine, Lisinopril, Atorvastatin, and Senna. (*See id.* at 467.)[10]

*c. Disability Examiners*

In a disability determination signed on August 1, 2023, disability examiner N. Cleary noted that Plaintiff's Adult Medically Determinable Impairments ("MDIs") were severe lumbar

---

[10] Gabapentin is a prescription medication used to treat nerve pain, among other conditions. *Gabapentin*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/drugs/21561-gabapentin (last visited Oct. 13, 2026). Furosemide, Amlodipine, and Lisinopril are prescription medications that may be used to treat hypertension. *Furosemide (oral route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/furosemide-oral-route/description/drg-20071281 (last visited Oct. 13, 2026); *Amlodipine (oral route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/amlodipine-oral-route/description/drg-20061784 (last visited Oct. 13, 2026); *Lisinopril (oral route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/lisinopril-oral-route/description/drg-20069129 (last visited Oct. 13, 2026). Cyclobenzaprine is a prescription muscle relaxant used to relieve muscle pain. *Cyclobenzaprine (oral route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/description/drg-20063236 (last visited Oct. 13, 2026). Tramadol is a pain reliever. *Tramadol (oral route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050 (last visited Oct. 13, 2026). Atorvastatin is used to lower cholesterol. *Atorvastatin (oral route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/atorvastatin-oral-route/description/drg-20067003 (last visited Oct. 13, 2026). Venlafaxine is a prescription medication used to treat depression. *Venlafaxine (oral route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/venlafaxine-oral-route/description/drg-20067379 (last visited Oct. 13, 2026). Senna is a laxative medication. *Senna (oral route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/senna-oral-route/description/drg-20406012 (last visited Oct. 13, 2026).

spinal stenosis, non-severe essential hypertension, and non-severe asthma. (*See id*. at 73.) Cleary stated that Plaintiff could occasionally lift or carry up to 20 pounds and could frequently lift or carry up to 10 pounds. (*See id.* at 74.) Cleary found that Plaintiff could frequently climb ramps or stairs, kneel, and crouch, and could occasionally climb ladders, ropes, or scaffolds, balance, stoop, and crawl. (*See id.*) Cleary found that Plaintiff had environmental limitations (a need to avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation). (*See id.* at 75.) Cleary concluded that, despite some limitations, Plaintiff was not precluded from performing her past relevant work as a dental assistant and that Plaintiff is not disabled. (*See id.* at 76.)

In a disability determination signed on August 18, 2023, disability examiner J. Juodaitis discussed Plaintiff's reported symptoms and conditions, finding that her MDIs included non-severe lumbar spinal stenosis, essential hypertension, and asthma. (*See id.* at 82.) The examiner acknowledged that Plaintiff experienced pain but concluded that Plaintiff was not disabled. (*See id.* at 82-83.)

Disability examiner G. Rodriguez prepared a determination dated December 7, 2023, finding Plaintiff's MDIs to be non-severe lumbar spinal stenosis, essential hypertension, and asthma. (*See id.* at 88.) Rodriguez noted that Plaintiff experienced pain and weakness but concluded that she was not disabled. (*See id.* at 88-89.)

*d. Robert S. April, M.D. (Independent Examiner)*

Plaintiff arranged for Dr. Robert April, a neurologist, to perform an independent medical examination on August 8, 2024. (*See id.* at 419.) He reported that Plaintiff had hypertension and

chronic lumbar degenerative spine disease with radiculopathy and left-sided sciatica. (*See id.* at 419, 621.)[11]

### III. The ALJ Hearing

On August 15, 2024, Plaintiff appeared telephonically with counsel before ALJ Sedaca. (*See generally* R. at 32-69.) In a letter dated July 18, 2024, Plaintiff's non-attorney representative raised Plaintiff's problems with her right hand and wrist, noting that X-rays had been ordered and mentioning Plaintiff's history of mental health issues. (*See id.* at 419.)[12]

Plaintiff's counsel stated that the 2017 MRI supported Plaintiff's complaints regarding her lumbar spine impairment and radiculopathy and therefore demonstrated that Plaintiff was disabled prior to her 2018 DLI. (*See id.* at 37.)

The ALJ pointed out that, aside from documentation from 2016 for treatment unrelated to Plaintiff's back pain and the 2017 MRI results, Plaintiff's treatment record prior to being transferred to Dr. Brooks' care in 2019 is sparse. (*See id.* at 38.) The ALJ requested that counsel obtain support for Dr. Brooks' position that Plaintiff's symptoms "relate[d] back several years before she saw her." (*Id.*)

Plaintiff testified that Dr. Lasalandra had prescribed a cane, which she began using about five years prior to the hearing. (*See id.* at 47.) Plaintiff said that her physical pain had

---

11 Sciatica is pain that travels along the sciatic nerve, which runs from the buttocks and down the legs. Sitting for a long time can exacerbate the pain. *Sciatica*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/sciatica/symptoms-causes/syc-20377435 (last visited Oct. 9, 2026).

12 Plaintiff's struggles with mental health were not raised in her application for SSD/SSI. At the hearing, Plaintiff's counsel said she has no mental health treatment records. Her Venlafaxine prescription was noted in her examination with Dr. Xie. (*See id.* at 60, 467.)

worsened over time and that she had begun to experience back spasms and numbness in her right foot. (*See id.* at 50-51.) She did not recall her first MRI in 2017. (*See id.* at 51-52.) She testified to developing numbness in her right hand, which left her unable to "hold something for a long period of time," which was concerning because her prior position as a dental assistant required her to hold sharp instruments. (*Id.* at 52-53.) Plaintiff discussed her asthma, testifying that she needed to use her inhaler after walking three or four blocks. (*See id.* at 55-56.) Dr. Xie reported that Plaintiff could not walk on her heels and toes or squat halfway and had trouble getting on and off the exam table. (*See id.* at 25.) Plaintiff said she could stand for about an hour if she used her cane for support. (*See id* at 58.) The ALJ in her decision stated that Plaintiff walked with a cane, although it is not clear whether she used the cane to balance. (*See id.* at 23.)

Counsel for Plaintiff said that she was going to request medical records from both Columbia Presbyterian and Farrell Community Health Center, to get more information pre-dating Plaintiff's DLI. (*See id.* at 48-49.) There is no indication any such records were provided.

The VE testified that a person with the same vocational profile as Plaintiff with the residual functional capacity ("RFC") to perform medium work – which entails "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds," 20 C.F.R. §§ 404.1567(c), 416.967(c) – subject to being limited to occasionally climbing, stooping, and kneeling, with no crawling or concentrated exposure to fumes, could perform the following jobs in the national work setting: package sealer, 920.685-074; hand packager, 920.587-018; and a stubber, 222.687-034. (*See id.* at 62-63.)

If the hypothetical individual were confined to light work – meaning the person could "lift[ ] no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and engage in a "good deal" of walking or standing, 20 C.F.R. §§ 404.1567(b), 416.967(b) – the VE indicated the following jobs were available: marker, 209.587-034; order caller, 209.667-014; and mail clerk, 209.687-026. (*See* R. at 63.)

If the hypothetical individual were limited to both the medium and light work positions and could frequently use her dominant hand with no limitations on the other hand, the VE testified that the same jobs would be available; if she were limited to occasionally handling with the dominant hand, the medium work jobs would not be possible, but light work jobs as an investigative dealer accounts/inventory taker, 241.367-038, usher, 344.677-014, and furniture rental consultant, 295.357-018, would be available. (*See id.* at 63-64.) The VE testified that if the same hypothetical person could work only occasionally with her fingers (pinching or picking), she could not perform the medium work jobs, and the only available light work jobs would be investigative dealer accounts/inventory taker, usher, and furniture rental clerk consultant. (*See id.* at 66.) The VE observed that if the hypothetical individual were unable to lift and carry up to five pounds, she could not perform light and medium work jobs. (*See id.* at 65.)

The VE answered questions about use of a cane, testifying that if a cane was needed for balancing, neither the medium or light exertional jobs were possible, and if it was needed to walk, it would preclude the light work jobs and presumably also the medium work jobs, which are more physically demanding. (*See id.* at 67.)

If the hypothetical person was on task less than 90 percent of the time or had unscheduled absences at work more than once a month, the VE noted that she could not perform work in the national economy. (*See id.* at 64-65.)

## DISCUSSION

### I. Legal Standards

#### A. Deciding a Motion for Judgment on the Pleadings

"Under Rule 12(c), a party is entitled to judgment on the pleadings if [s]he establishes that no material facts are in dispute and that [s]he is entitled to judgment as a matter of law." *Rosario v. Comm'r of Soc. Sec.*, No. 20-CV-7749 (SLC), 2022 WL 819810, at *5 (S.D.N.Y. Mar. 18, 2022) (citing *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999) and *Morcelo v. Barnhart*, No. 01-CV-0743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003)).

#### B. Judicial Review of the Commissioner's Decision

A district court may affirm, modify, or reverse – with or without remand – a final decision of the Commissioner. *See* 42 U.S.C. § 405(g); *Skrodzki v. Comm'r of Soc. Sec.*, 693 F. App'x 29, 29 (2d Cir. 2017). The inquiry is "whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).

"Failure to apply the correct legal standard constitutes reversible error . . . ." *Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)); *Calvello v. Barnhart*, No. 05-CV-4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008), *report and recommendation adopted*, 2008 WL 4449357 (S.D.N.Y. Oct. 1, 2008).

In "certain circumstances, failure to adhere to the applicable regulations" counts as a failure to apply the correct legal standard and therefore is reversible error. *See Douglass*, 496 F. App'x at 156 (quoting *Kohler*, 546 F.3d at 265). Courts review de novo whether the ALJ's legal conclusions were based on the correct legal principles. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (reversing where the ALJ's decision "was not in conformity with the regulations promulgated under the Social Security Act").

When "the ALJ has applied an improper legal standard," the reviewing court may remand to the ALJ to develop the record. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996). If there was legal error, the reviewing court must assess whether the error was harmless. *See Townley*, 748 F.2d at 112. If a court concludes that the ALJ used the correct legal standards, or if any legal error was harmless, the court then "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam). The substantial evidence standard is quite deferential: "once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." *Id.* at 448. If the evidence is susceptible to more than one interpretation, the court must uphold the ALJ's conclusion. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982). A court "may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991).

However, a court may not defer to a determination by the ALJ if it is the product of legal error, including a failure to set forth "a discussion of the evidence" and the "reasons upon

which [the decision] is based," 42 U.S.C. § 405(b)(1). While the ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (awarding legal fees when the ALJ ignored or mischaracterized evidence); *Kohler*, 546 F.3d at 268-69 (holding that remand was appropriate when the ALJ overlooked and mischaracterized evidence); *Ruiz v. Barnhart*, No. 01-CV-1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (remanding when the ALJ had ignored evidence). Thus, in assessing whether there is substantial evidence to support the ALJ's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013).

Setting aside the decision and remanding is appropriate where the record was not fully developed, or where any legal error was not harmless, or where the decision was not supported by substantial evidence. *See McClean v. Astrue*, 650 F. Supp. 2d 223, 226 (E.D.N.Y. 2009) (citing *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)).

C. Determination of Disability

Under the Act, a person who has a disability and is insured for disability benefits is entitled to disability benefits. *See* 42 U.S.C. §§ 423(a)(1)(A); 20 C.F.R. §§ 404.101, 404.120, 404.315(a). The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In determining whether impairments meet the statutory definition of disability, the ALJ "must make a thorough inquiry into the claimant's condition and must be mindful that the Social Security Act is a remedial statute, to be broadly construed and liberally applied." *Mongeur*, 722 F.2d at 1037. Accordingly, the ALJ's decision must consider factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.*

1. Five-Step Inquiry

The Commissioner must conduct a five-step inquiry to determine whether an individual is disabled and therefore entitled to disability benefits. *See* 20 C.F.R. § 404.1520(a)(1). First, the Commissioner must determine whether the claimant is currently engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), (b). If so, the claimant is ineligible for benefits and the inquiry ends. What constitutes substantial work activity is work involving carrying out significant physical or mental activities, whereas gainful work activity involves work usually done for pay or profit. *See* 20 C.F.R. §§ 404.1572(a), (b).

If the claimant is not engaged in any such activity, the Commissioner must determine in the second step whether the claimant has a severe impairment, which is an impairment or combination of impairments that significantly limits his ability to perform basic work activities.

*See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). If the claimant does not have an impairment or combination of impairments that are severe, the claimant is not entitled to benefits and the inquiry ends. *See id.*

If the claimant has a severe impairment or combination of impairments, the Commissioner continues to step three and must determine whether the impairment or combination of impairments is, or medically equals, one of the impairments included in the "listings" of qualifying disabilities contained at 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. If the claimant's impairment or impairments meet or medically equal one of those listings, the Commissioner presumes the claimant is disabled, and the claimant will be eligible for benefits. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

If the claimant does not meet the criteria for being presumed disabled, the Commissioner continues to the fourth step and must assess the claimant's RFC, which is the ability to perform work activities on a sustained basis despite her impairments. *See* 20 C.F.R. § 404.1520 (a)(4)(iv); 20 C.F.R. § 404.1545 (a)(1). The Commissioner then determines whether the claimant possesses the RFC to perform the claimant's past work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), (f), (h). If so, the claimant is not eligible for benefits and the inquiry ends.

If the claimant is not capable of performing her prior work, the Commissioner must continue to step five and determine whether the claimant can perform other available work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), (g), (h). If the claimant, as limited by her RFC, can perform other available work, the claimant is not entitled to benefits. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), (v).

The claimant bears the burden of proof for the first four steps. *See Selian*, 708 F.3d at 418. If the claimant shows that she is unable to perform her past work, the Commissioner bears the burden of showing at the fifth step that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater,* 142 F.3d 75, 80 (2d Cir. 1998); *see also* 20 C.F.R.§§ 404.1520(a)(4)(iv), (v).

2. Evaluation of Medical Opinion Evidence

For claims filed on or after March 27, 2017, a treating doctor's opinion is no longer entitled to a presumption of controlling weight; instead, all medical opinions are evaluated for their persuasiveness. *See* 20 C.F.R. § 404.1520c(a)(c) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from your medical sources"). "Although the new regulations eliminate the perceived hierarchy of medical sources . . . the ALJ must still articulate how [he or she] considered the medical opinions and how persuasive [he or she] find[s] all of the medical opinions." *Amber H. v. Saul*, No. 20-CV-490 (ATB), 2021 WL 2076219, at *4 (N.D.N.Y. May 24, 2021) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1), 416.920c(a), (b)(1)). The regulations place the most significance for the persuasiveness assessment on the extent to which a physician's opinion is supported by well-accepted medical evidence and consistent with the rest of the record. *See* 20 C.F.R. § 404.1520c(a) ("The most important factors we consider when we evaluate the persuasiveness of medical opinions . . . are supportability . . . and consistency."). "[S]upportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion," *Aponte v. Kijakazi*, 692 F. Supp. 3d 257, 265 (S.D.N.Y. 2023), whereas "consistency is an all-

encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record[.]" *Id.*

Beyond merely considering the supportability and consistency of medical source opinions, the ALJ must explain how she analyzed those factors. *See* 20 C.F.R. § 404.1520c(b)(2); *Vellone v. Saul*, No. 20-CV-0261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) ("[I]n cases where the new regulations apply, an ALJ must explain his/her approach with respect to the first two factors when considering a medical opinion"), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021).

An ALJ's failure to properly consider and apply the consistency and supportability factors may be a basis for remand. *See, e.g.*, *Rivera v. Comm'r of Soc. Sec.*, No. 19-CV-4630 (LJL) (BCM), 2020 WL 8167136, at *22 (S.D.N.Y. Dec. 30, 2020) (remanding so that the ALJ could "reevaluate the persuasiveness assigned to the opinion evidence of record and explicitly discuss both the supportability and the consistency of the consulting examiner's opinions"), *report and recommendation adopted*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021); *Andrew G. v. Comm'r of Soc. Sec.*, No. 19-CV-0942 (ML), 2020 WL 5848776, at *5-9 (N.D.N.Y. Oct. 1, 2020) (remanding due to the ALJ's failure to adequately explain the supportability or consistency factors that led to the decision); *see also* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). A court need not remand the case if the ALJ committed only harmless error, such that the "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala*, 595 F.3d at 409.

As Plaintiff's application post-dates March 27, 2017, the Court must apply the revised regulations on evaluating medical opinions.

3. Evaluating Plaintiff's Credibility

SSA regulations provide that statements of subjective pain and other symptoms, standing alone, cannot establish disability. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). The ALJ must follow a two-step framework for evaluating allegations of pain and other symptoms. *See Genier*, 595 F.3d at 49. The ALJ first considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the alleged symptoms. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Genier*, 595 F.3d at 49 (citing 20 C.F.R. § 404.1529(a)). Among the additional kinds of evidence that an ALJ must consider in addition to objective medical evidence are the "individual's daily activities"; the "location, duration, frequency and intensity" of the pain; the type and effectiveness of any medication the individual takes to alleviate pain; other treatments the individual has received for relief of pain; and any other measures the individual uses to relieve pain, such as lying down. *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *11 (S.D.N.Y. Dec. 3, 2008).

If the ALJ's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *See McLaughlin v. Sec'y of Health, Educ. & Welfare,* 612 F.2d 701, 704-05 (2d Cir. 1980). However, "[t]he Second Circuit has held that where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (quoting *Williams v. Bowen,* 859 F.2d 255, 260-61 (2d Cir. 1988)).

4. The ALJ's Duty To Develop the Administrative Record

Disability-benefits proceedings are non-adversarial, and so the ALJ has an affirmative obligation to develop a complete administrative record, even if the claimant is represented by counsel. *See Lamay v. Astrue*, 562 F.3d 503, 508-09 (2d Cir. 2009). Whether the ALJ discharged this duty "is a threshold issue." *Romero v. Comm'r of Soc. Sec.*, No. 18-CV-10248 (KHP), 2020 WL 3412936, at *12 (S.D.N.Y. June 22, 2020).

"[T]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." *Rosario*, 2022 WL 819810, at *6 (S.D.N.Y. Mar. 18, 2022). "If a gap exists in the administrative record[,] then the plaintiff has not been afforded a full and fair hearing and the ALJ has failed in his or her duty to develop the administrative record." *Dufresne v. Astrue*, No. 12-CV-049 (MAD) (TWD), 2013 WL 1296376, at *5 (N.D.N.Y. Mar. 8, 2013) (citing *Hankerson v. Harris*, 636 F.2d 893, 897 (2d Cir. 1980)), *report and recommendation adopted*, 2013 WL 1289759 (N.D.N.Y. Mar. 27, 2013). Under those circumstances, a court will remand the case for further development of the evidence or for more specific findings. *See Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).

The ALJ's affirmative is obliged to develop the administrative record even if the claimant is represented by counsel who did not raise the issue. That is, a reviewing court has authority to remand sua sponte based on the ALJ's failure to develop the administrative record. *See, e.g.*, *Sanchez v. Saul*, No. 18-CV-12102 (PGG) (DF), 2020 WL 2951884, at *18 (S.D.N.Y. Jan. 13, 2020) (noting a court's duty to ensure that the administrative record has been adequately developed "regardless of whether the issue is raised by the plaintiff"); *Castillo v. Comm'r of Soc. Sec.*, No. 17-CV-09953 (JGK) (KHP), 2019 WL 642765, at *7 (S.D.N.Y. Feb. 15, 2019) (holding that even

where the claimant does not argue that an ALJ failed to develop the record, the court "is nevertheless obliged to conduct its own independent assessment of whether the ALJ properly discharged this duty"); *Miranda v. Comm'r of Soc. Sec.,* No. 22-CV-4226 (PKC), 2023 WL 6385727, at *6 (E.D.N.Y. Sept. 29, 2023) ("Even where the plaintiff does not raise the issue [of the ALJ's duty to develop the record], the Court must independently consider the question of whether [the ALJ satisfied that duty].").

## II. The ALJ's Decision

On December 16, 2024, in an 11-page decision, the ALJ concluded that Plaintiff was not disabled prior to October 15, 2020 and determined that on that date, Plaintiff became and has continued to be disabled. (*See* R. at 19-29.) Therefore, the ALJ found, Plaintiff was not disabled within the meaning of the Act on her DLI of June 30, 2018. (*See id.* at 20.)

***Step One***. At step one of the five-step inquiry, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, January 16, 2016, through the date of the decision. (*See id*. at 21-22.)

***Step Two***. At step two, the ALJ concluded that, since January 16, 2016, Plaintiff had the following severe impairments: lumbar degenerative disc disease, hypertension, and obesity. (*See id*. at 22.) She found that the medically determinable impairments significantly limited Plaintiff's ability to perform work activities as required by the regulations. (*See id.*)

***Step Three***. At step three, the ALJ concluded that, since January 16, 2016, Plaintiff had not had any of the listed impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. (*See* R. at 22.)

***RFC/Step Four.*** The ALJ turned to determining Plaintiff's RFC and step four. In making this assessment, the ALJ stated that she considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," including "the medical opinion(s) and prior administrative medical filing(s)." (*Id.* at 23-25.)

The ALJ found Dr. Brooks' opinion to be unpersuasive, because Dr. Brooks' conclusions regarding Plaintiff's ability to sit, stand, and walk conflicted with Plaintiff's testimony and because no evidence supported Dr. Brooks' "exaggerated limits." (*Id.*) The ALJ deemed Plaintiff independent due to her ability to care for herself and conduct activities of daily living. (*See id* at 25-26.)

The ALJ discussed Dr. Xie's consultive medical opinion regarding Plaintiff's complaints of "low back pain and sciatica, right hand carpal tunnel syndrome, hypertension and asthma," noting Dr. Xie's corroborated findings of gait abnormalities, the need for a cane, and diminished musculoskeletal range of motion. (*Id.* at 25, 27.) The ALJ concluded that Dr. Xie's opinion was somewhat persuasive, to the extent that it was consistent with a less than light exertional capacity. (*See id.* at 27.)

The ALJ also mentioned that state disability consultants had found Plaintiff's impairments to be non-severe and concluded that she was able to perform light exertional work. (*See id*. at 26-27) The ALJ believed that the opinion of these consultants was somewhat persuasive. (*See id.*)

For the period before October 15, 2020, the ALJ found that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms,"

Plaintiff's statements regarding "the intensity, persistence, and limiting effects" of her symptoms were not fully supported prior to October 15, 2020. (*Id.* at 23.) The ALJ explained that where Plaintiff's statements were not substantiated by objective medical evidence, she had considered other evidence to assess the limitations on Plaintiff's ability to perform work-related activities. (*See id.* at 23.)

The ALJ summarized Plaintiff's testimony and outlined the limited medical evidence from 2016 and 2017: Plaintiff's emergency room visits in 2016, the 2017 MRI showing severe musculoskeletal impairment, and a physical exam during which Plaintiff complained of knee pain. (*See id.* at 23-24.) The ALJ also acknowledged that Plaintiff's clinical obesity could cause exertional and postural limitations and affect her ability for sustained activity, and the ALJ considered those effects in assessing Plaintiff's RFC. (*See id.* at 24) The ALJ pointed out that the 2017 MRI lacked "accompanying notes by a pain management or orthopedic specialist documenting a course of care, or treatment by a physical therapist or chiropractic provider." (*Id.*) However, the ALJ noted that Plaintiff had visited the emergency room in April 2016 "for hypertension and chronic pain management with Meloxicam." (*Id.*)[13]

For the period since October 15, 2020, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" and that Plaintiff's statements regarding "the intensity, persistence, and limiting effects" of her symptoms were supported, even though there was no evidence in the record that Plaintiff had

---

13 Meloxicam is a prescription nonsteroidal anti-inflammatory drug commonly taken to relieve symptoms of arthritis, including "inflammation, swelling, stiffness, and joint pain." *Meloxicam (oral route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/description/drg-20066928 (last visited Oct. 14, 2026).

received treatment in 2021. (*See id.* at 25.) The ALJ also found that, after October 15, 2020, Plaintiff would be on task less than 90 percent of the time. (*See id*. at 24.)

The ALJ ruled that prior to October 15, 2020, and after that date, Plaintiff had the RFC to perform light work, meaning that she could lift up to 20 pounds at a time and frequently carry objects weighing up to 10 pounds and could engage in a "good deal" of walking or standing, except that she could only occasionally climb, stoop, kneel, crouch, and/or balance and was unable to crawl and should not have concentrated exposure to fumes or dust. (*See* R. at 22-24.)

***Prior Relevant Work.*** The ALJ concluded that there was no prior relevant work, because Plaintiff's last job was too far in the past. (*See id.* at 21, 27.)

***Step Five.*** At step five, based on the Medical-Vocational framework, the ALJ found that prior to October 15, 2020, Plaintiff's RFC, age, education, and work experience allowed her to perform other available work. (*See id.* at 27-28.) The ALJ found that post-October 15, 2020, Plaintiff could not perform any job existing in significant numbers in the national economy. (*See id.* at 28.)

## III. Analysis

Plaintiff argues that the ALJ failed to properly evaluate the medical opinion evidence, leading the ALJ to reach an incorrect RFC for Plaintiff; and that the ALJ failed to properly evaluate Plaintiff's subjective statements in making an adverse credibility determination. (*See* ECF 8, Pl.'s Br. at 5-14.) The Commissioner counters that the ALJ's decision was supported by substantial evidence and the ALJ properly evaluated Plaintiff's subjective complaints. (*See* ECF 10, Def.'s Brief at 5-10.)

For the reasons set forth below, I conclude that the ALJ failed to develop the administrative record; I also conclude that the ALJ made adverse credibility determinations without properly evaluating Plaintiff's pre-October 2020 subjective complaints. Thus, I respectfully recommend that Your Honor grant Plaintiff's motion for judgment on the pleadings and remand this case for further administrative proceedings.

A. The ALJ's Duty To Develop the Administrative Record

1. The Parties' Arguments

Plaintiff first argues that the ALJ improperly found Dr. Brooks' opinion to be unpersuasive and incorrectly determined Plaintiff's RFC. (*See* ECF 8, Pl.'s Br. at 5-6.) Defendant counters that the RFC was supported by substantial evidence, asserting that Plaintiff's is taking the position "that the ALJ should have deferred to the opinion of treating physician Dr. Brooks." (ECF 10, Def.'s Br. at 5.) But Plaintiff never suggests that the ALJ should have deferred to Dr. Brooks' opinion. Rather, Plaintiff takes the position that ALJ failed to sufficiently articulate her reasons for finding Dr. Brooks' opinion to be unpersuasive. (*See* ECF 8, Pl.'s Br. at 9.)

Plaintiff contends that her 2017 MRI, which is substantially similar to her 2020 MRI, supports the limitations noted by Dr. Brooks; Plaintiff asserts that Dr. Brooks could extrapolate from Plaintiff's condition at the time of the 2020 MRI to Plaintiff's functional capacity at the time of the 2017 MRI. (*See* ECF 8, Pl.'s Br. at 6-8.) Plaintiff also contends that the ALJ failed to point to any "significant inconsistent evidence relevant to [Plaintiff's] functioning prior to the DLI" (*id.* at 7), arguing that her ability to walk for three or four blocks and stand for an hour does not contradict Dr. Brooks' more restrictive limitations, because the former capabilities apply in more relaxed situations while the latter limitations are relevant during 40-hour

workweek. (*See id.*) And Plaintiff asserts that the ALJ placed undue weight on Plaintiff's ability to carry out activities of daily living. (*See id.* at 8-9.)

Defendant responds that Plaintiff inappropriately seeks a reweighing of the evidence. (ECF 10, Def.'s Br. at 9.) Defendant explains that the relevant question is not whether a rational factfinder could have concluded that Plaintiff's RFC was less than sedentary, but rather whether a reasonable factfinder could have reached the same conclusion as the ALJ. (*See id.*)

2. Discussion

Plaintiff's assertion that the ALJ failed to explain why she found Dr. Brooks' opinion to be unpersuasive is incorrect. The ALJ said she viewed the opinion as unpersuasive because Dr. Brooks' assessment of Plaintiff's limitations (1) was inconsistent with Plaintiff's testimony and (2) was unsupported. (*See* R. at 26.) And the ALJ is correct that there are inconsistencies between Plaintiff's testimony and Dr. Brooks' opinion. For example, as the ALJ noted, Dr. Brooks said that Plaintiff was incapable of sitting, standing or walking more than one hour total during an eight-hour workday, even though Plaintiff testified that she walks three or four blocks before needing to stop and can stand for a maximum of one hour at a time before needing to sit. (*See id.*)

As to supportability, the ALJ accurately said that (1) there "[we]re no objective clinical findings in the contemporaneous treating notes to support" Dr. Brooks' opinion that Plaintiff would miss more than three days of work per month and would need hourly unscheduled breaks, and (2) Dr. Brooks provided no explanation or support for her opinion that Plaintiff's physical condition would have been the same years before Dr. Brooks began treating her. (*Id.*)

Based on the foregoing, I cannot conclude that the ALJ improperly discounted Dr. Brooks' opinion.

As to whether the RFC was supported by substantial evidence, the ALJ herself noted the sparseness of the record. (*See id.* at 22-25.) Even with Dr. Brooks' opinion, the record contained no medical source opinion from a doctor who had examined Plaintiff around the time of her DLI of June of 2018. And once the ALJ found Dr. Brooks' post-October 2020 opinion to be unpersuasive, the record contained no medical source opinion from any treating physician. (*See id.* at 26.) Those two gaps are significant, which leads me to conclude that the ALJ failed to carry out her responsibility of developing the record with respect to Plaintiff's condition prior to her DLI.

Courts in this Circuit have consistently held that an ALJ violates her duty to develop the record if she makes an RFC determination when no functional assessment exists in the record, or when any such assessments are insufficient and she does not request a functional assessment. *See Romero*, 2020 WL 3412936, at *12 (collecting cases); *Brooks v. Kijakazi*, No. 20 CV-7750 (GBD) (JLC), 2022 WL 213994, at *17 (S.D.N.Y. Jan. 25, 2022) (applying the same principle under current regulations, which revised the treating physician rule), *report and recommendation adopted*, 2022 WL 715424 (S.D.N.Y. Mar. 10, 2022); *Newton v. Berryhill*, No. 18-CV-1244 (MPS), 2019 WL 4686594, at *2 (D. Conn. Sept. 26, 2019) (finding that the ALJ was required to inquire further to "understand why a treating physician believed that [the claimant's] ability to work was impeded – at least where there was no function-by-function analysis from a treating physician and . . . no information whatsoever from any medical source for nearly half of the relevant time period").

"[D]espite the new regulations, an ALJ's duty to develop the record takes on heightened importance with respect to a claimant's treating medical sources, because those sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *Brooks*, 2022 WL 213994, at *17; *Gene L. v. Comm'r of Soc. Sec.,* No. 20-CV-0152 (CR), 2022 WL 178968, at *6 (D. Vt. Jan. 20, 2022) (explaining that, "[a]lthough an ALJ need not defer to the opinions of a claimant's treating sources under the [SSA's] new regulations, the new regulations do not lessen an ALJ's duty to develop the record").

An ALJ's failure to request a functional assessment from a treating physician may be harmless, and thus no remand is warranted, in cases where "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec*., 521 F. App'x 29, 34 (2d Cir. 2013). For example, remand may not be necessary when the ALJ rejects the medical opinion evidence in the record, but the RFC determination is supported by substantial evidence of functional capacity from "contemporaneous treatment notes." *Monroe v. Comm'r of Soc. Sec*., 676 Fed. App'x 5, 8-9 (2d Cir. 2017). But "[a] decision not to remand assumes that there are no obvious gaps in the record precluding the ALJ from properly assessing the claimant's residual functional capacity." *Brooks*, 2022 WL 213994, at *17; see also *Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (explaining that the ALJ was obligated to develop the record when there were "obvious gaps"). Courts uphold an ALJ's RFC assessment "only where the record is clear and, typically, where there is some useful assessment of the claimant's limitations from a medical source." *Staggers*

*v. Colvin*, No. 14-CV-0717 (JCH), 2015 WL 4751123, at *3 (D. Conn. Aug. 11, 2015). To satisfy the duty to develop the record, "an ALJ should have medical evidence from a medical source with a sufficiently persuasive opinion noting the existence and severity of a disability." *Brooks*, 2022 WL 213994, at *17.[14]

The record here contains no such evidence. The ALJ states that the record prior to October 2020 "is limited but confirms significant lumbar disc disease and comorbidities of hypertension and obesity." (R. at 23.) The ALJ the summarizes the evidence on which she bases Plaintiff's RFC: treatment notes reflecting multiple emergency room visits for pain (treated by Meloxicam) and cardiac symptoms, at which Plaintiff's blood pressure was elevated but her physical examination was otherwise normal; the 2017 MRI, which established a "severe musculoskeletal impairment"; and the absence of notes by a pain management or orthopedic specialist documenting a course of care, or treatment by a physical therapist. (*Id.* at 24.) The ALJ does not discuss the other medical sources in connection with her assessment of Plaintiff's RFC prior to October 2020, which leads me to believe that the ALJ limited her consideration of the other treating sources to the analysis of Plaintiff's post-October 2020 RFC. Thus, in determining Plaintiff's pre-October 2020 RFC, the ALJ did not rely on any "medical evidence from a medical

---

[14] The ALJ's duty to develop the medical record cannot be delegated to Plaintiff; accordingly, that Plaintiff's counsel indicated she would seek out medical records from before the DLI does not excuse the Commissioner's failure to develop the record. *See Carr v. Comm'r of Soc. Sec.*, No. 16-CV-5877 (VSB) (JCF), 2017 WL 1957044, at *10 (S.D.N.Y. May 11, 2017) ("[T]he ALJ has an affirmative duty to develop the record that is independent of the plaintiffs' duty to provide evidence."). Indeed, the ALJ's duty to develop the record kicks in precisely when an applicant's evidence has gaps. Accordingly, Plaintiff's burden to produce evidence in support of her claim does not nullify an ALJ's responsibility to develop the medical record to bridge "obvious gaps." *Eusepi*, 595 F. App'x at 9.

source," let alone one "with a sufficiently persuasive opinion noting the existence and severity of a disability." *Brooks*, 2022 WL 213994, at *17.

During the pre-October 2020 period, Plaintiff was under the care of Dr. Lasalandra. Indeed, it was Dr. Lasalandra who ordered the 2017 and the 2020 MRIs. (*See* R. at 439-40, 485-86.) Yet the ALJ opinion makes no mention of Dr. Lasalandra. Given the spotty record, made more so by the ALJ's discounting Dr. Brooks' opinion, the ALJ's failure to request information, including a medical opinion or RFC assessment, from the doctor who arguably was the most knowledgeable about Plaintiff's condition prior to October 2020 was not harmless error. *See Fontanez v. Colvin*, No. 16-CV-01300 (PKC), 2017 WL 4334127, at *26 (E.D.N.Y. Sept. 28, 2017) (holding that the ALJ should have sought an RFC assessment from a treating physician who regularly examined the plaintiff, particularly given conflicting medical evidence and lack of explicit functional assessments).

B. <u>Adverse Credibility Determination</u>

Plaintiff also contends that the ALJ failed to properly evaluate Plaintiff's subjective description of her symptoms. (*See* ECF 8, Pl.'s Br. at 11-12.) The Commissioner responds that the ALJ's evaluation of the subjective complaints was "thorough and consistent with the requirements of 20 C.F.R. §§ 404.1529 and 416.929." (ECF 10, Def.'s Br. at 9.) Courts in this District routinely remand cases for further administrative proceedings when the ALJ failed to provide sufficient explanation for finding a claimant's self-reported symptoms to be unsupported. *See, e.g.*, *Daniels v. Kijakazi,* 617 F. Supp. 3d 180, 192-93 (S.D.N.Y. 2022) (remanding where the ALJ made an adverse credibility determination but provided "a neutral summary of the various medical opinions in the record followed by only the briefest analysis of

each opinion"); *Dixon v. Berryhill,* No. 17-CV-0334 (AJP), 2017 WL 3172849, at *15 (S.D.N.Y. July 26, 2017) (noting that, where an ALJ concludes that a claimant's statements about her symptoms are unsupported by the record, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated"). I therefore turn to whether the ALJ explained with enough "specificity to permit intelligible plenary review" of her conclusion that Plaintiff's report of the severity of her symptoms was not fully supported before October 2020. (ECF 8, Pl.'s Br. at 13 (citing *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260-261 (2d Cir. 1988)).)

The ALJ set out Plaintiff's testimony and outlined the limited medical evidence from 2016 and 2017: as relevant here, the ALJ cited Plaintiff's emergency room visits in April 2016 for chronic pain and hypertension and the 2017 MRI showing severe musculoskeletal impairment. (*See* R. at 23-24.) The ALJ accepted that Plaintiff's severe documented medical impairments – degenerative disc disease of the lumbar spine, radiculopathy, and obesity – could be expected to have caused her symptoms (*see id.* at 23), but she concluded, using boilerplate language, that the medical evidence did not support the reported severity. (*See id.*)

The ALJ noted the absence of evidence that Plaintiff had been treated for pain management or had been seen by an orthopedist or physical therapist (*see id.* at 24), but she provided no explanation why Plaintiff's description of her symptoms was inconsistent with not having been seen by an orthopedist or physical therapist. (*See id.*) This omission is relevant because there is evidence in the record from 2016 that Plaintiff had been prescribed pain medication, specifically Meloxicam. (*See id.* at 610.)

Defendant argues that the ALJ relied on inconsistencies between Plaintiffs description of her symptoms and her reported activities. (*See* ECF 10, Def.'s Br. at 9.) But while the ALJ mentions Plaintiff's activities of daily life, the ALJ does nothing to link those activities with the credibility of Plaintiff's subjective complaints (*see* R. at 25-26), and many of those activities could be performed in increments over time if Plaintiff experienced pain. The ALJ's recitation of Plaintiff's medical history and activities "falls short of a proper credibility analysis in accordance with the Commissioner's regulations and case law." *Smith v. O'Malley*, No. 23-CV-02339 (JLC), 2024 WL 1983881, at *13 (S.D.N.Y. May 6, 2024) (holding that the ALJ's mere recitation of the claimant's medical history, without explaining the discrepancies between their subjective statements and medical evidence, allowed her to substitute her own judgment and was not an adequate assessment of the claimant's subjective statements).

The absence of a proper credibility analysis for Plaintiff's reported symptoms before October 2020 is problematic in light of the ALJ's conclusion that Plaintiff's statements about her symptoms after October 2020 were consistent with the medical record (*see* R. at 25), even though the results from the October 2020 MRI described slight progression since the 2017 MRI but concluded that the findings were "without appreciable change" (*id.* at 438). The ALJ's assessment that Plaintiff's symptoms were not fully credible before October 2020 appears to rest on the absence of notes in 2017 "by a pain management or orthopedic specialist documenting a course of care, or treatment by a physical therapist or chiropractic provider." (*Id.* at 24.) However, as the ALJ acknowledges, there was no evidence in the record reflecting that Plaintiff received treatment for pain in 2021 (*see id.* at 25), yet the ALJ found Plaintiff's reported symptoms at that time to be credible.

The credibility of Plaintiff's symptoms is significant, because the determination that Plaintiff was not disabled before October 2020 but was disabled thereafter appears to rest on the finding that Plaintiff would be on task the less than 90 percent of the time after October 2020 but not before. (*See id.* at 24.) The ALJ concluded that Plaintiff has the RFC to perform light work both before and after that date. (*See id.* at 22-27.) The VE testified that being on task less than 90 percent of the time would preclude a hypothetical person of Plaintiff's age, education, and RFC from holding down a job available in the national economy. (*See id.* at 64.)

While the ALJ never expressly explains why she believes Plaintiff would be on task less than 90 percent of the time after October 2020 but not before, Plaintiff's testimony suggests that she became distracted due to pain. (*See id.* at 45.) Accordingly, the credibility or not of Plaintiff's subjective description of her complaints, including pain, is highly relevant to the determination that Plaintiff was disabled after October 2020 but not before. The ALJ's failure to present a sufficient credibility analysis therefore is not harmless error and warrants remand. *See Reece v. Kijakazi*, No. 22-CV-674 (BCM), 2023 WL 6211788, at *15 (S.D.N.Y. Sept. 25, 2023) (holding that an ALJ's error may be "disregarded as harmless where substantial evidence support[s] the [ ] overall credibility determination") (citing *Suttles v. Colvin*, 645 F. App'x 44, 47 (2d Cir. 2016)).

**CONCLUSION**

For the foregoing reasons, I respectfully recommend that Plaintiff's motion be GRANTED and that the case be REMANDED for further proceedings. In particular, the ALJ should be directed to (1) supplement the record by contacting Dr. Lasalandra to obtain an RFC assessment and medical records for the period before Plaintiff's DLI; and (2) if the ALJ again concludes that

Plaintiff's description of the severity of her symptoms before October 2020 was not entirely supported, explain the basis for that conclusion. I further respectfully recommend that Your Honor should direct the Clerk of Court to substitute Frank J. Bisignano, the Commissioner of the Social Security Administration, as Defendant in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure,

Dated: October 23, 2026
New York, New York

Respectfully Submitted,

**ROBYN F. TARNOFSKY**
**United States Magistrate Judge**

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO REPORT AND RECOMMENDATION**

The parties shall have fourteen days (including weekends and holidays) from service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Ramos.

THE FAILURE TO OBJECT WITHIN FOURTEEN DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Thomas v. Arn,* 474 U.S. 140, 145 (1985).